UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————X

United States of America,

                                          15 CR 491 (KBF)

      -against-

Steven Pastore,

          Defendant.
——————————————————X

Sentencing Submission for Defendant Steven Pastore

Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
914-763-2122
vivian@shevitzlaw.com

Larry J. Silverman
Of counsel.
zorroesq@gmail.com

## SENTENCING SUBMISSION FOR DEFENDANT STEVEN PASTORE

This memorandum is respectfully submitted on behalf of Steven Pastore in anticipation and in support of a lenient sentence.

On February 12, 2018, Steven Pastore pled guilty before Your Honor to Count I of the superseding indictment, stating that between 2013 and 2014,[1] he had conspired to participate in the affairs of a criminal enterprise through participating in an illegal sports betting gambling operation that used offshore wire rooms -- in violation of 18 U.S.C. § 1962.

For this conduct, the parties' agreement embraces a stipulated Guideline level of 19, because the conviction is under RICO and under U.S.S.G. 2E1.1, it carries a level 19 base level, though the Guideline level for the underlying racketeering activity is level 12. (Plea agreement p,2, paragraph A.9; U.S.S.G. 2E1.1 directs that the "greater" of the levels be applied.)

The plea agreement contemplates a 3-level reduction for Mr. Pastore's acceptance of responsibility. The applicable Guideline level is

---

[1] Embarrassingly, counsel failed to correct the dates: the correct dates are 2014-2015, not 2013-2014. There was no conduct preceding 2014.

level 16, carrying, for Mr. Pastore (Criminal History Category I) a sentencing range is 21 -27 months' imprisonment.

The agreement leaves open the right and opportunity (of both parties) to "seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." (Plea agreement p.3).

The PSR reports the parties' Guideline agreement but reports in its final paragraph (para.117):  A sentence within the applicable guideline range may be greater than necessary to comply with the sentencing purposes set forth in 18 U.S.C.  §3553(a)(2)."

Based on the history and characteristics of Steven Pastore, and the devastating harm to his family that would result from Steven's incarceration, pursuant to 18 U.S.C. §3553(a), Steven Pastore and his family respectfully request that the Court grant a non-incarceratory sentence.

<u>The Offense</u>:

Though Count I of the superseding indictment alleges an enterprise that was operated through racketeering acts occurring from 2008 through 2016, Steven Pastore's alleged and acknowledged participation

involved solely a one-year period, 2014-2015.

Paragraph 24 of the Presentence Report acknowledges that "STEVEN PASTORE's involvement in the criminal activity was limited to participating in an illegal sports gambling operation and transmitting wagering information in connection with that operation.").

The government's evidence establishes only that Mr. Pastore assisted for a short period of time by taking over Ellis's runners -- nothing beyond that role. (As noted, fn1, Steve's allocution misstated the years. The actual period was not 2013-2014, but rather 2014-2015). During that period, the government conducted substantial surveillance. The only evidence as to Mr. Pastore's actual role is that he met with *some* of the runners that previously were managed by Ellis.

The fact that there is no evidence that Mr. Pastore met with any runners or anyone else *beyond* Ellis's runners rebuts the notion that Mr. Pastore was the "office" or the "bank" for the entire operation. The evidence does not support a charge that Steven Pastore had any role beyond helping Ellis out.

Not only is there no evidence that his "role" extended beyond Ellis' runners, but there is an absence of evidence of "tribute" payments that

3

would have been paid to Mr. Pastore if he were "in the hierarchy" as is alleged as to others in paragraph 30 of the PSR.    Mr. Pastore's role was limited, in length of time and in scope.

<u>Criminal History Category</u>:    Steven Pastore's criminal history category is I.

Steven's criminal conduct has been on for gambling activity.

Steven became involved in New Jersey "policy" gambling and was charged in the District of New Jersey in 2005.  Consistent with his belief in taking personal responsibility, Steven pleaded guilty.  In August 2006, as the PSR describes, Steven Pastore was sentenced by the District Court in New Jersey to a 2-year probationary term.

All of Steven Pastore's misconduct has consisted of gambling-related activity to which he has succumbed for limited times.  Steven has never had a history of violence.  With his history, Steven Pastore is given a Criminal History score of I.

<u>Steven Pastore - 18 USC 3553(a)</u>:

As the letters to Your Honor reveal, Steven Pastore is the rock of his family's existence and exudes love and caring to the point of

selflessness.   Every letter to Your Honor tells the same, honest, urgent story of Steven:  he is a devoted family man, who, though completely disabled, gives every ounce of his energy and love to help his family, who needs him, and pretty much everyone else he has met.

Steven Pastore is 58 years old and has lived a life that has not been easy.  He lives with his wife of 30 years, Jodi Pastore, his daughter, and two of his three sons, one of them severely autistic but flowering because of Steven and Jodi's love and guidance.  Sadly, Steve and Jodi's oldest son Anthony is an addict who strays from home and who often disappears for long periods.

Jodi Pastore explains that she and Steven are an "old-fashioned couple": "Home-cooked family dinner every night, 6 p.m. don't be late.  No cell phones at the table.  We go around the table and talk about what went on in our day."

Even before they met, Jodi writes, Steven had lost his brother (when Steven was 15) and his mother passed away when Steven was 24. With a broken family, he was "pretty much on his own" at age 25.

Steven worked as a union plumber for 35 years.  Jodi recalls that there were many days when he came home with burns and bruises.  The

work was demanding and physical.

Steven always got up at 5:00 am to go to work, and worked until the day was done, until – after two heart attacks, a number of surgeries on his back, feet, and shoulders, and a quadruple bypass (all by the time he was 40)  – he became completely disabled and thus was compelled to retire.   Though they "lost everything he worked so hard for", Steven started over and "built back."

As explained in paragraph 79 of the PSR, after Steven became ill with heart problems, they had to sell their house in Long Island and relocated to Staten Island.  They were lucky to be able to sell before the bank commenced the foreclosure proceeding.  They moved closer to family and built their lives back.

The Social Security Administration granted Steven Pastore full disability benefits, by decision dated June 9, 2011 (Case 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).

The family lives modestly in Staten Island,[2] maintaining their lives on Steven's two regular sources of income: a monthly disability payment from Social Security, and, another monthly disability payment from his Union's pension fund. As will be discussed below, Steven (and his family) will, by statute, lose these payments if he is incarcerated.

Jodi writes that Steven "has always tried, with some mistakes, to be an endless dedicated, selfless, devoted, loyal and traditional man.



Through all the "ups and downs", Steven has supported Jodi and "tried to give [her] a wonderful life.

Jodi has never worked outside the house during their marriage.  In their partnership, Jodi's job was to care for the children – a big job – and to be the homemaker.  Steven "did it all to provide for [Jodi] and the kids."

As to their kids, "[t]here was always someone's friend eating over with us, our door was always open.  There are holidays and celebrations in our home filled with family and friends."  Steven would quiz his children (and their guests) about school, and "would ask them questions about history, math or reading their reports."  He was interested, and made it clear to this kids that they should be too.  Steven has always "stressed the importance of being hard-working, responsible, and loving."  The kids have always "laughed when Steven would show them a game that he grew up playing."  To this day, Jodi writes, they "tease Steven that it's 2018."  His reply is always the same:  "In this house it's 1960."

Life has handed the Pastores a tough hand, though.

Three of the four Pastore children remain living at home.  Anthony, age 27, is, however, homeless, but not for lack of Steven's trying.  Anthony, who became a union plumber like his dad, went from diving

scholarships, to three colleges, to being a homeless person with a heroin addiction that has now addled the family for ten years.

Steven did not give up on Anthony any of the time he went through overdoses (6 times), rehabs (8 times), and going through job after job. Steven and Jodi live a "tough love" life with Anthony, but they have tried to keep up contact with him and always let him know they care.  Yet, Jodi writes, he has "Stopped working and left his apartment, [and] at this point we don't know where he is or if he is alive."  Jodi is "nervous all the time, anytime the phone rings, my heart sinks."  Jodi confides it is "exhausting and terrifying", and that as she was writing the letter being presented to Your Honor, she realizes that she "fear[s] getting that unconsolable call, and not having Steven by my side."

Steven has not sat around waiting.  "Steven searches for [Anthony] constantly", in drug dens they know of, and "walks around asking people if they saw him."  He wants his son and his other children to know that "we all make mistakes and his Dad will always be there to help him rebounds…."  Steven "is in church weekly praying or us and our son Anthony's safe return to our world, our family."

Steven has also been there for their son Nicholas, now 22 years old.

Steven never missed the "good times" – he was there for baseball, basketball, swimming, all events.   But, says Jodi, "the good times are easy.  Steve also slept on a broken chair in the hospital for three days while Nicholas was having surgery and everything was going wrong. Steven never wanted him to think he was alone and he wasn't.  Steve was there."

Nicholas was in Hunter College until Steven's arrest. He transferred to C.S.I. (College of Staten Island) to be able to spend more time with his family, and will finish in 2019.  He will stay around to be close if his family needs his help.

Janine is 21 years old.  Janine's is employed in a very successful 65-employee salon in Manhattan. She has worked there for 1 1/2 years on a full-time five-day schedule. She is moving up in position to get a hairdressing chair with-in the year.

Both she and Nicholas do not miss a day of work or school.

As to Janine, Steven will "do anything for [her]" – still his baby girl -- and lets her know it.  Janine lives at home and depends on her dad. Steven picks Janine up from the ferry after she has worked a 12-hour day.  They ride home together, they sit together watching TV, talking

about career choices, or laughing or crying over events of the day.  Jodi fears: "Her rock won't be there.  It is heartbreaking."

Then there is Bobby.  Bobby is now 20 and has severe autism.   He could not speak for many years.  He did not learn to use the bathroom until age 8.  He is evaluated in the 1% capability of his age group.  He will always have challenges.  He is thrown off by any unpredictable frustrations.  It is agonizing.

Yet, Steven "tackled this unknown time with patience, compassion and determination that one day Bobby would grow into a productive adult."  Jodi and Steven are Bobby's official caretakers pursuant to a legal guardianship, presciently established.

Bobby is now in a school work program.  He is never unsupervised. He has learned to express himself, and, taught by his dad, "now Bobby is able to do things on his own" and is filled with love, compassion, strength and confidence.

But Bobby needs stability.  Steven's absence, if Your Honor orders a sentence of incarceration, will surely destabilize Bobby's progress.  Jodi writes that whenever "something dramatic happens, there is a downward spiral".

Before further discussing Bobby's educational needs, and the family's financial situation – the two circumstances that would most be affected by a sentence of incarceration – it bears noting that Jodi's assessment of her husband's character is echoed by all.

Nicholas Pastore, Steven and Jodi's son, says that it is "not difficult at all" to ask for leniency because of the "immense list of things my father has done for me to support me."  There "hasn't been a moment my father wasn't there for me, both good and bad times."  He explains:  "Well, not just me, but my siblings, my mom, my cousins, my aunts, my uncles, my friends, my neighbors, everyone.  That's the type of person my father is, he will drop anything to give someone a hand."

Nicholas says that his dad "doesn't do it for anything in return.  He would actually get annoyed if someone looked to repay him in some way.  He always told me, `I just do it because it's the right thing to do.'"

He taught by example.  For 40 years he got up quietly and went to work.  He would come back dirty and bruised.  His work ethic is "incredible."

Nicholas pleads for leniency for "two absolutely crucial reason" – Anthony and Bobby.  It is only because of Steven that they have not lost

Anthony.   Steven "is the one who takes all the punches when it comes to my brother.  Not upset the house.  Yet, he is there for him every time when it matters.  When he's overdosed my dad was at his hospital bed, when he's gone to rehab my dad was walking through the doors right behind him and visiting every weekend without question."

When Nicholas started to hate his own brother his dad "showed me how to be compassionate and how to forgive him for the hardship he has caused everyone around him."

As to Bobby, Nicholas explains that because of Steven's hard work with Bobby, Nicholas was "able to watch Bobby grow and become a person, not just a being."    "For a long time it was Bobby screaming or Bobby having accidents or Bobby biting.   For years the behavior went on.  Today I look at Bobby and you can't help but to be proud of his progression.  He's made great strides and while he'll never be on his own, he will be happy and lead a meaningful life.  This again is because of my father.  He never quit on Bobby, while Bobby was frustrating everyone else around him, my dad was there to scoop him up."

Janine writes about her "best friend", who has been her 'favorite person in the whole world.  It is clear there is a special and loving

relationship.  "He still waits up for [Janine] to come home every night that I go out, and I love knowing that he will be there when I get home." They meet up on the couch and watch their favorite television shows together.

Janine, too, says that Steven has always made her feel protected and save, and at the same time always made her feel comfortable going to him if she needed to talk.   "He has taught us how to be good, trustworthy, reliable and hard-working people."

Janine shares a concern about her dad's health.  He has a history of heart trouble:  recently (while this case has been pending) he had a heart attack "that scared us all tremendously."  All the recent stress of the last few years, including Anthony's struggle with drugs, has not helped Steven's own health needs.   Moreover, because Steven has had such a huge role in Bobby's life, Janine fears that a sentence of prison for her father would "be a huge set-back" for Bobby and hence the family.

This is especially concerning because Jodi's father lives in Howard Beach and is requiring more of her attention.  Stanley Gussin, Jodi's 85-year-old dad, ran his own business for 55 years (dry cleaners).  Ten years ago or so he began to suffer from Parkinson's Disease.   At first he

exhibited hand shaking. One would not even have known he had the disease. About 2 years ago, however, things started changing. Mr. Gussin needed to use a walker and had to move to the downstairs of the house because he cannot walk the steps any longer. He had to stop driving, because his reaction time slowed. He cannot cut his food well. So Jodi has helped him, including cooking soft things, so he could do it himself.

As time has gone on, he now needs help showering and dressing. He uses a wheel chair for anything outside the house. He needs to be feed due to the uncontrollable shaking. He cannot sign his name. So it falls on Jodi to do all his errands (cooking, shopping, banking, doctors etc.) Further, Jodi had to get a hospital bed and a shower chair and toilet near his bed. He cannot move fast enough to get to the bathroom that's 5 feet away.

Jodi's brother lives with the father and helps take care of daily things. Jodi is trying to arrange for someone to go help out on the days she cannot come.

The problem is that someone has to be home when Bobby arrives – at 3:00 every day. It would put an additional strain on the Pastore family

and would be very difficult if Steven is unavailable.

Although the family would prefer that Bobby's problems do not become the public face of their life, there are some aspects of Bobby's behavior that should be highlighted to make it clear that without Steven, Bobby's life, and that of his family, will be in jeopardy.

For instance, every day, when Bobby gets home from school, he repeats the same behavior – and if something goes wrong, it upsets him (and therefore the family) for perhaps days.  He goes to the mailbox when he gets home.  If he is expecting something that was ordered and it is not in the mailbox, he repeatedly asks, or chants, "when is it coming"  when is it coming?  When is it coming? …."  This behavior – called "stimming", usually accompanied by physical arm flapping and other exasperated movement -- continues into the house, and could go on for hours or even days, if he is not calmed down.

Steven is the one who has to calm him down.  (Indeed, the bus service will not let him get off of the bus unless Steven or Jodi is there. )

Once Bobby comes into the house from the bus, he immediately strips off his clothes.  It does not matter if anyone else is there.  He is a large man now, and his behavior can only be "controlled" by someone who

can manage him physically.  That person is Steven.

He has other behaviors that are challenging on a daily basis.  For instance, although he is described as a nice person at heart, he has an odd behavior when he goes to a birthday party.  He has a bad reaction when people sing "happy birthday" to the celebrant:    he goes on the attack – physically – and attack and say crazy, nasty things.  It is Steven who must contain him.

Because Bobby does not like to stay with anyone else and because it is important to the family, Bobby comes to all the family events -- except in a catering hall.  He can't take the noise.  Many times Steven has sat with him in the car while the rest of the family is celebrating, to calm him down.

The same thing happens on vacation.  The family has tried to take a driving vacation once a year.  Bobby will not go anywhere except to go out to eat.  Steven often will stay in the room with Bobby.

Bobby is getting stronger.   At age 21 Bobby is now about 140 pounds.  Jodi really won't be able to handle him much longer.  If he has medical needs that require taking him to a doctor, he has to be physically restrained.  Steven has had to restrain Bobby to take him to the dentist.

Through great effort Steven and Jodi have made the house calm. Bobby is calm 90% of the time, they say.  He plays in his room with computers or dresses "his girls", which are Barbie dolls.

If Bobby's routine is not broken their life can stay calm.  If Bobby's routine is broken all hell will break loose.

Steven is well aware he should have thought of Bobby and his needs before he "did this," as the prosecutors have rightfully advised when we discussed the matter with them.  But:  push has come to shove.

There are other letters – from Steven's only sister and her daughters, Steven's nieces, his sisters in law, his father in law, his nephews, and from friends who have known Steve and Jodi for a long time.  To a person, they describe the same good man.  He has been there for all of them.  Steven "is one of the best people you will ever know."

It is not only his family Steven cares for.  His neighbors, Elizabeth Strocchia and Jessica Alava, explains how Steven and Jodi invited them into their family.  Ms. Strocchia describes:

> A few days after they moved in, I was approached by Steven
> and his wife and asked if I needed help with my daughter,
> who was 8 years old at the time. As a single mom, and
> working full time, I said "REALLY", how much do you
> charge for babysitting? The response was we are not looking
> to charge you, we have kids who go to the same school and

would be happy to take care of your daughter while you are
at work. I was shocked and tears filled my eyes because I
have not met anyone in a long time who does anything from
the goodness of their hearts.

Stephanie went to their home every morning before school,
had breakfast and was walked to the bus stop. After school
Stephanie went back to the Pastore's home until I got home
from work. Steve always watched out for Stephanie while
she was growing up, and to this day, his concern and
kindness have not dwindled one bit. When Stephanie was in
Steve's care, I never worried. I always knew Steve would
look out for her well-being.

Steven also has taken care of Ms. Strocchia's dad, now 85 years old,
moved from Brooklyn to Staten Island to live with her when he was 80.
Steve "took time out of his day to help my dad around Staten Island until
he learned his way around" and "always offered to take my dad to any
doctor's appointments of just sat with him to keep him company."   And
"Steven never expects anything in return.  Whatever he does, it is done
out of love and concern for others."  (This is a recurring and common
theme through all the people Steven met in his life.  He does things for
others even when others *cannot* return the favor or even the good will).

Jessica Alava, another neighbor, says that writing about Steve
means writing about the Pastore family.  They "are not individuals they
are a whole."  "They are the family other children may dream about.

Dinner is at 6, and if you were around, you better be hungry because they will always have you eat."

When Jessica was 13 years old a friend of hers passed away suddenly and her life, she writes, could not have been worse.  At that time, the Pastores moved in next door "and my life changed. Steven gave me a purpose, a reason by giving me support and encouragement.  In her senior year Jessica's family moved to New Jersey and she was devastated and was bullied at the new school, as she had feared.  Steven "stepped up, spoke with my mom, and welcomed me in their home for the remainder of the year" to live with the Pastores to finish high school, which she did.  She now has her own 11-month old child and the Pastores are his caretakers.  "We're lucky."

Rosemarie Reese, a friend of Jodi's since they were five years old, highlights another reason why Steven is a "mensch."  Jodi, Steven's wife, is Jewish, and Rosemarie's family, Catholic, and Jodi's, shared each other's holidays.  When Steven came on the scene he came not only for the food, so to speak:  he went above and beyond learning about Jodi's family rituals.  Rosemarie describes the "loving banter between Jodi and Steven after all these years together" as "priceless."

Finally, Nicholas' friend Matthew Lucenti, a 24-year-old active-duty Marine stationed at Camp Pendleton, with a tour in Iraq, met Steven 12 years ago when he befriended Nicholas. They lived on the same block.

Unsurprisingly, Matthew began to feel welcome and spent a lot of time around the Pastore home, at their table, than he did at his own, struggling to figure out how to live his life.

When he decided to enlist, he feared telling the Pastores more than his own family, lest – Matthew feared – it be somehow disappointing.

Steven made clear it was not disappointing. "Not only did he openly support and embrace my decision, but he also drove 12 hours down to Parris Island, SC, to surprise me at my graduation a few months later. A 24-hour round trip in 2 days was tough, but he knew what being there meant to me."

Matthew says he learned life's most important lessons from Steven: "Many of the lessons and values that I teach to my younger Marines were learned from Steven, not the military. Things such as being physically and mentally tough, being grateful for the simple things such as good health and loved ones, and his personal favorite `It's not the size of the

dog in the fight that matters, it's about the size of the fight in the dog.'"

Matthew admits: "We've always liked to laugh when he says that last one, but it's to that mentality that I owe any and all success that I've achieved in my life."

This is the offender Your Honor must sentence. His family and he ask for a sentence as lenient as possible, no greater than necessary.

## Factors supporting a variance

### <u>Bobby</u>

The Pastores' former neighbor Jessica Alava is currently a teacher "who specializes in behaviors with children and adults with Autism." She became interested in this when she started babysitting for the Pastore children on weekends.

She fears for Bobby and the Pastore family should Steven be incarcerated, writing:

> Bobby can be challenging at times. Unfortunately, Bobby is unable to handle change and unable to handle anything out of schedule. If Steven has to be away for any amount of time, I am unsure if Bobby will be able to handle it which means this can disturb his everyday behavior. It can make him lash out on teachers at school and on family at

home.   Bobby tends to not eat when upset or over eat both leading to him becoming sick.   Although Bobby has autism, Steven always accepted him for who he is and the family have gotten through all his behaviors and challenges TOGETHER. I cannot imagine how they would handle it any other way."

For the Pastore family, this is indeed a crossroad.   Bobby's special Education Teacher has written the Court that beyond "normal" problems, the teacher fears that a disruption at this time will have a "profound affect upon [Bobby's] stability and progress."

Next year "is crucial for Bobby".   It is his "last year in a school setting."   Bobby will "age out" of the school.

"Unlike typical children who graduate and go off to college his parents have to select the right post secondary placement" to meet Bobby's needs "for potentially the rest of his life." *Any* disruption that causes regression "can affect Bobby's potential placement as his escalating behaviors and perseveration will directly impact his acceptance into post-secondary programs."

The teacher fears that "if Dad (who is a stabilizing, loving force) is missing he will regress to the point of limiting his options in regards to the quality of agencies accepting Bobby and his needs."

23

This unintended but certain consequence of a sentence of incarceration for Steven Pastore, we respectfully suggest, means that the sentence is greater than necessary and not in the interest of justice.

### **Financial Ruin**

As Jodi Pastore writes – and the PSR confirms – Steven and Jodi's financial circumstances are modest, and fully depend on Steven's disability payments.  For ten years, the family has lived on about $4,400.00 in disability payments – about $2,200.00 from Social Security disability, and another approximately $2,200.00 that the Union benefit pays for his disability – *as long as he can prove that he is receiving the disability payment* from Social Security.

Jodi writes that she has not told the children yet that they could face the need to become earners or more if their father is incarcerated. Jodi herself knows of no way to earn enough money to take care of the family.   She has been the family caretaker and does not have a saleable skill.   It is not that Jodi is not willing to get a job:   her job is being the family caregiver.

The statutes and rules provide that the government may and will take away Steven's Social Security payments if/when he is incarcerated for more than 30 days.[3]

---

[3] Section 339 of the Social Security Amendments of 1983, Pub. L. 98-21, suspends payments of old-age, survivors, and disability insurance benefits to persons in prison for conviction of a felony.    See 42 CFR 404.468, entitled "Nonpayment of benefits to prisoners", is supposedly a revenue provision to help the government balance its funds.  Singling out old and disabled defendant/inmates, its states:

> (a) General. No monthly benefits will be paid to any individual for any month any part of which the individual is confined in a jail, prison, or other penal institution or correctional facility for conviction of a felony. This rule applies to disability benefits ( § 404.315) and child's benefits based on disability ( § 404.350).

Subsection (c) describes "confinement" to mean "a jail, prison, or other penal institution or correctional facility … under the control and jurisdiction of the agency in charge of the penal system or in which convicted criminals can be incarcerated." And it provides that "confinement … continues as long as the individual is under a sentence of confinement and has not been released due to parole or pardon. An individual is considered confined even though he or she is temporarily or intermittently outside of that facility (e.g., on work release, attending school, or hospitalized)."

According to the Social Security literature, benefits "are suspended if an otherwise eligible person is confined in a jail, prison, or other penal institution for more than 30 continuous days due to conviction of a crime."    While the Commissioner "for good cause shown" may "pay the individual benefits", accomplishing this Order would probably be daunting.

Moreover, if an inmate receiving disability benefits (as opposed to old age benefits) is incarcerated for over a year, he, like anyone on disability, would have to go through the entire disability application process anew.

Oddly, the laws incentivize the Bureau of Prisons or its contactors in giving up names of the inmates for money.  Counsel believes that these provisions – which add penalties only as to defendants who are old or disabled, impose an

Steven's Union also provides disability payments.  However, as a condition of receiving the more-or-less $2,200.00 /month from the Union, each year the Pastores must show the Union the fact (and amount) of the Social Security disability payments.  (The provision in pdf is accessible by                                    this                                    link). https://www.ppnpf.org/docs/Summary%20on%20Recovery%20of%20Disability.pdf)   If Social Security is cut off, as it will be if Mr. Pastore is incarcerated, he will also not receive the Union's benefit.

If Steven is incarcerated and cannot receive social security disability payments, the family faces ruin.  Hopefully the government should not want to bring about this immense hardship.  There is reason to grant a non-incarceratory sentence.

Indeed, counsel suggests, the additional consequence of sentencing a Social Security recipient to incarceration – *i.e.*, the loss of Social Security benefits (and in this case to the resulting loss of union disability payments) – would constitute an illegal sentence.  Imposed to enrich the Treasury, it is not a sentence authorized by Congress for a particular

unconstitutional additional penalty and do so unequally.  Regardless, any such conclusion would not be readily forthcoming to help the Pastore family.

26

crime. Moreover, it touches only old and disabled people who are otherwise eligible for and receiving disability or Social Security payments. It is an unauthorized additional *sentence* and should be deemed excessive punishment in this case.

### Medical Issues

We finally note Steven's own medical issues. Dr. Kevin Marzo provided a letter, which we submit with (at the end of) the letters from family and friends.

Dr. Marzo has been treating Mr. Pastore for about 15 years. Mr. Pastore has a history of prior cardiac bypass surgery.

About a year ago, after this case began, he had a "recurrent myocardial infarction" and was treated at a hospital on Staten Island, NY. Dr. Marzo is following Mr. Pastore "for chronic heart disease, shortness of breath and angina." Mr. Pastore "requires long-term cardiac monitoring."

### Murphy v. NCAA, __ U.S. __ (U.S. May 14, 2018)

On May 14, 2018, the Supreme Court, demonstrating the sea change in attitudes toward gambling on sports events, decided that the

federal statute barring States from allowing sports betting is unconstitutional.  New Jersey and New York – and other states – have already enacted or are about to enact statutes that allow and regulate sports betting.  *Illegal* sports betting opportunities will no longer exist. See https://www.nytimes.com/2018/05/14/us/politics/supreme-court-sports-betting-new-jersey.html   ("The Supreme Court struck down a 1992 federal law on Monday that effectively banned commercial sports betting in most states, opening the door to legalizing the estimated $150 billion in illegal wagers on professional and amateur sports that Americans make every year.")

## CONCLUSION

Steven Pastore and his family respectfully ask for a non-incarceratory sentence.

While Probation recommends a sentence of six months' incarceration, we strongly believe that the goals of sentencing can be achieved with confinement at home instead of in a prison setting.

If the Court instead believes that a period of confinement is required, Steven Pastore and his family respectfully asks that the Court

impose a sentence of home confinement so that he can continue caring for his family and avoid losing the family's only income as a consequence of incarceration.

Steven knows that he has violated the law and also is of course aware that he was given the break of a probationary sentence in 2006. He succumbed to the gambling business in 2014. Even though he lapsed, he asks for leniency still.

Defendant asks the Court to impose a non-incarceratory or "house arrest" sentence and impose the lowest fine it believes sufficient but not greater than necessary to achieve the purposes of sentencing.

Any period of supervision should allow travel in the District of New Jersey (a shopping locale for residents of Western Staten Island) as well as the Eastern District of New York.

Dated: May 18, 2018

/s/_____
Vivian Shevitz
Attorney for Steven Pastore
46 Truesdale Lake Drive
South Salem, New York 10590
914-763-2122

Larry J. Silverman, of counsel