Vivian Shevitz
Attorney at Law
46 Truesdale Lake Drive
South Salem, New York 10590
914-763-2122
vivian@shevitzlaw.com

June 26, 2018

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   United States v. Steven Pastore- 15cr491(KBF)
            Request for Order directing government to provide
            discovery in anticipation of sentencing hearing.

Dear Judge Forrest:

     This Court has now scheduled what is described on ecf "bounces" as either a hearing or a conference on August 8, 2018. I write in anticipation of that hearing or conference to further explain why an order directing the government to provide evidence it intends to use in such hearing. (If it is not a hearing, we need clarity on what the August 8, 2018 conference will address.)

     Mr. Pastore agreed to be responsible for "an appropriate amount of forfeiture" but has taken the position that there is *no* "appropriate amount" -- because he did not obtain "proceeds" and no evidence supports the government's lavish claim.

     The government indicted this case before *Honeycutt* was decided. Prior to that case, the government's broad theories about joint and several forfeiture had been accepted regardless of whether the government could prove an individual defendant "obtained" tainted funds. In the discovery we have seen to date, and in its sentencing

1

positions (see Gov. letter dated 6/14/2018, DOC 651), the government is seemingly re-adopting the broad positions: it intends to use the same non-specific calls and surveillances to show that Mr. Pastore *met* with runners, and/or that runners had claimed that they owed money (or in some cases claimed that they had paid "the guy"). It takes the position that such evidence is sufficient to prove that Mr. Pastore "obtained" tainted, and forfeitable assets.

    We submit it does not, much less would it suffice to prove a specific amount. Taped conversations provided in discovery show runners talking about how they were lying about how much they intended to or did pay. They were in fact bettors, who lost, and lied about the source of their losses, resulting in an accounting nightmare. They did not meet regularly with Mr. Pastore during the period he took over for Ellis. Mr. Pastore was not around long or often.

    Scott Jacobson tells a guy named Morris, a third party, that (apparently unlike Ellis) Pastore "won't see him unless eight ($8,000), ten ($10,000, twelve ($12,000), twenty two ($22,000)." Jacobson tells Morris that he, Jacobson, is "pretty rough with his numbers" and really does not know what he owes. Jacobson, the same as the other runners, made his own bets and lied about the source.

    Of course, Mr. Pastore was not on trial when Scott Jacobson testified, and so had no opportunity to demonstrate, from material handed over in discovery, that Mr. Jacobson was unreliable.

    Discovery also revealed that other runners; statement are also untrustworthy to prove actual receipt of any specific amounts Mr. Pastore. For instance, Sokol – one of Ellis' runners -- told a guy named "Dave" that he was borrowing money to pay a gambling debt but was going to lie to Mr. Pastore about it. On 10/14/2014, Sokol reportedly said he will "give Pastore a story" about "Jig" not paying. Sokol appears to have been the bettor but was going to tell Mr. Pastore that he, Sokol, was trying to get the money from the losing bettor. (10/11/14 and 10/14/14 conversations).

    Forfeiture requires specific tracing. *Honeycutt* reaffirms this.

2

As far as we have seen in discovery, the government cannot trace, much less trace any specific amount. There is nothing to corroborate Mr. Pastore receiving any specific amount of money.

Although AUSA Estes previously advised that the government had bank records evidencing that Jacobson withdrew funds from his bank before he met Mr. Pastore on one day, Ms. Estes then told us she had been mistaken. (Even if the government were to show that Jacobson withdrew money from his own bank account, that account may not have contained "proceeds" of the gambling or RICO conduct at issue. We have not seen any evidence it can or intends to do so.)

Now the government states that "there are no bank records" (Gov. letter DOC 651 p.2). Instead, it will rely on facts elicited at the Delligatti trial that "payments in the Gambling Operation were cash payments that were often passed in envelopes" and presumably statements of Scott Jacobson about payments he claims to have made.

Mr. Pastore, of course, was not on trial and so had no opportunity to question the witnesses the government uses against him in this sentencing proceeding. This is why we have been asking the government to provide us sentencing discovery (we believe is *Brady* material) supporting its assertions in this forfeiture case.

The government contends Mr. Pastore should be liable for forfeiture of everything "the Gambling Operation" made because -- it claims it showed at the trial (or will show at a hearing) (or will just make the statement) -- "Pastore was the `office' of the Gambling operation" and "the buck literally stopped with Pastore." (DOC 651, p.2 n.2).

Even were that to suffice after *Honeycutt*, requiring individual *in personam* criminal forfeiture and tracing of tainted property, we have not seen evidence that supports the assertion that Mr. Pastore was the "office" before, during, or after the period of Ellis's 2014-15 incarceration.

Perhaps the government is relying on the January 29, 2015 taped statement of Scott Jacobson, made in an outgoing call to one Morris (not a co-conspirator, as far as we know).  Though Ellis had been incarcerated in 2014, Scott Jacobson told Morris that "all he knows" is that "his guy (Ryan Ellis) is going "on a pinch", and that Ellis "is introducing him to The Guy – "*you know like the bank*."  (Call 39316, 2/29/2015 (emphasis added).

The evidence demonstrates no more than that Mr. Pastore operated – for the short period of time he was involved -- in the same way as did witness Sowulski prior to his partnership with Ellis. Sowulski testified (Tr.1505-10) that, he (Sowulski) had placed wagers by calling a phone number and, starting his own business, gave friends a number or "the website".

His "office" was the Costa Rica "office".  All the accounting was done in that office.  The operator's business was to collect and pay out moneys to bettors.

When asked what that meant, Sowulski testified that a lot of customers, meant a "big office." (Tr.1513).  Asked what he was referring to "[w]hen you say office," Sowulski said it was just "his sports gambling operation" – "just a term we use." (*Id.*)

Clearly the word "office" means different things to people in the gambling business.

### *"Proceeds" in a gambling business*

The government cannot prove forfeitable proceeds because, in a case involving a gambling business, gambling business receipts must be reduced by gambling business payouts to runners for winning bettors or to employees made in the operation of a gambling business.

The government disputes this.  It claims it would be entitled to forfeiture of everything a defendant received even if he pays out on

4

winning bets and gives up some of what otherwise might be deemed "receipts". For this, it cites *United States v. Lizza Industries*, 775 F.2d 494, 498 (2d Cir. 1985) (Gov. letter 6/14/2018, DOC 651, p.2). It identifies *Lizza*'s holding as this: "forfeiture under the RICO statute is calculated based on gross rather than net, profits."

To the extent that *Lizza* remains viable, *Lizza* (a) did not involve a gambling case, and (b) *did* allow for "reduction" of the gross receipts the government wanted the defendant to forfeit by the amount of direct costs paid out of funds "obtained" in the crime.

*Lizza* has been criticized as contrary to the meaning of the statute. In *United States v. Masters*, 924 F.2d 1362, 1369-1370 (7th Cir. 1991), the Court explained that the forfeiture statute is actually meant to force criminals to "disgorge their ill-gotten gains", not more. The Seventh Circuit wrote:

> The jury ordered the defendants to forfeit $ 42,000 as "proceeds which the person [i.e., the defendant] obtained . . . in violation of" the RICO statute. 18 U.S.C. § 1963(a)(3). This is joint and several liability, *Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989); *United States v. Caporale*, 806 F.2d 1487, 1506-09 (11th Cir. 1986), meaning that $ 42,000 is the cap on the total amount that the government can collect but that subject to the ceiling each defendant is liable for the full amount. Masters and Keating argue that the government computed this figure (which the jury accepted) by adding up the amounts paid to Masters, in legal fees and bribes, by persons whom the criminal enterprise assisted, whether by fixing their cases or by protecting them from the law. Masters in particular argues that this amount must be an overestimate of the proceeds he obtained, since he forwarded some of the bribe money to his coconspirators and other police officers, and since some at least of the legal fees were not bribes at all but payment for lawful legal services.

5

> In fact the government presented the jury with evidence that Masters had obtained at least $ 66,000 in fees and bribes from the persons whom the enterprise assisted. The government wanted the jury to find that about two-thirds represented bribes received by these defendants; and this was a reasonable estimate. The problem is that Masters did not keep all those bribes, yet he was made jointly and severally liable for the entire amount. Most but not all of the bribes that he passed on ended up in the pockets of his codefendants, but again they were found jointly and severally liable for the entire amount.
>
> The statute is designed to force criminals to disgorge their ill-gotten gains. We may assume, therefore, as intimated in *Russello v. United States*, 464 U.S. 16, 22, 78 L. Ed. 2d 17, 104 S. Ct. 296 (1983), that the proceeds to which the statute refers are net, not gross, revenues -- profits, not sales, for only the former are gains.

The Court then observed that *Lizza* had "come out the other way" but was unprincipled:

> *United States v. Lizza Industries, Inc.*, 775 F.2d 492, 498 (2d Cir. 1985), came out the other way and allowed the recovery of gross proceeds, but the court made no effort to square its reading with the language of the statute. Furthermore, the statute says that it is the proceeds received by the defendants, not by their enterprise, that are forfeitable.

    *Honeycutt* has now reaffirmed the principle that *Masters* identified: there is no joint and several liability for forfeiture. *Honeycutt* requires tracing to a defendant, not to an enterprise.

    Moreover, *Lizza* **had** ordered a setoff for direct costs paid out of the moneys obtained. In a gambling context, direct costs include payments to runners and bettors – the very essence of a gambling business. That this is a correct reading of "proceeds" in a gambling case

is established by the Supreme Court's 2008 case, *United States v. Santos*, 553 U.S. 507, 524-527 (2008).

*Santos* involved the definition of "proceeds" in the money laundering statute, 18 U.S.C. 1956, and held that it could not mean gross receipts. Justice Stevens' controlling decision makes clear that in a *gambling* case, payouts to bettors and employees are part of the business. If payouts to bettors were deemed use of "proceeds" for purposes of the money laundering statute the defendant would be committing a new money laundering crime with each part of the business. Justice Stevens wrote:

> As Justice Alito rightly argues, the legislative history of § 1956 makes it clear that Congress intended the term "proceeds" to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales. But that history sheds no light on how to identify the proceeds of many other types of specified unlawful activities. For example, one specified unlawful activity is the conduct proscribed by § 541, "Entry of goods falsely classified." Section 541 provides that "[w]hoever knowingly effects any entry of goods, wares, or merchandise, at less than the true weight or measure thereof, or upon a false classification as to quality or value, or by the payment of less than the amount of duty legally due, shall be . . . imprisoned not more than two years." Conceivably the "proceeds" stemming from a violation of § 541 could be either the money realized by misstating the value —that is, the amount by which the criminal "profits" by paying reduced duties—or the total price at which the goods are later sold, even though the misclassification had only a trivial impact on that price.
>
> Just as the legislative history fails to tell us how to calculate the "proceeds" of violations of § 541, it is equally silent on the proceeds of an unlicensed stand-alone gambling venture. The consequences of applying a "gross receipts" definition of "proceeds" to the gambling operation conducted by

7

respondents are so perverse that I cannot believe they were contemplated by Congress, particularly given the fact that nothing in Justice Alito's thorough review of the legislative history indicates otherwise.

Constrained by a holding that the payment of expenses constitutes "promotion," Justice Alito's opinion runs squarely into what can be characterized as the "merger" problem. Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business. A money laundering conviction increases the statutory maximum from 5 to 20 years, and the Sentencing Commission has prescribed different Guidelines ranges for the two crimes. When a defendant has a significant criminal history or Guidelines enhancements apply, the statutory cap of five years in § 1955 is an important limitation on a defendant's sentence—a limitation that would be eviscerated if Justice Alito's definition of "proceeds" were applied in this case.

Although Congress then amended the money laundering statute – to define proceeds -- for the money laundering statute -- as gross receipts, 18 U.S.C. § 1956(c)(9), that statute does not control a RICO forfeiture or a gambling case.

We thus return to the *Honeycutt* case, which brought "forfeiture" closer to its real meaning – disgorgement of actually-obtained tainted proceeds that enriched the defendant improperly.

(Here, Mr. Pastore and his family in any event have no assets and would have to borrow funds to make any substantial forfeiture payment. This is something Mr. Pastore's friends and neighbors would

8

do if it would assure that the Pastore family would not suffer. They recognize that if Mr. Pastore loses all of his Social Security and Union disability payments by reason of incarceration, the family will be destitute. That is why they would provide funds if necessary.).

If the government wanted to obtain a larger forfeiture, it could have allowed a plea to the gambling offense, under 18 U.S.C. § 1955, instead of RICO. Section 1955 (d) provides: "(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States." Arguably this would provide the government a somewhat broader forfeiture – though given *Honeycutt,* this provision also might be limited to what a defendant personally obtained. In any event, the government required Mr. Pastore to plead to the RICO charge or it would force him to trial. That does not mean it should be allowed to extract a "forfeiture" of property that is not subject to forfeiture by law.

The government points out that that Mr. Pastore's co-defendants *agreed* to pay $90,000 and $75,000. That, of course, is irrelevant to the issues at hand. We believe that those defendants did not raise forfeiture defenses.

Moreover, if – as the government wrote – those are the amounts of proceeds actually obtained by Ellis (see government's sentencing letter as to Ellis, DOC 654, 6/14/2018), proportionally Mr. Pastore would be responsible for much less. He was involved for a much shorter period of time than Ellis and DeBello.

The government agrees (as does the Presentence Report, paragraph 24)[1] that Mr. Pastore's only involvement was for a period during 2014 and 2015, while Ellis was incarcerated on a different charge.

---

[1] "**STEVEN PASTORE's** involvement in the criminal activity was limited to participating in an illegal sports gambling operation and transmitting wagering information in connection with that operation. Therefore, the description of the offense conduct below is limited to only such activity." (PSR paragraph 24).

The government nonetheless wants Mr. Pastore to be liable for everything it thinks changed hands (or might have changed hands), because of the government's belief that Mr. Pastore was a 'Genovese Family" soldier who was "above" Ellis – contradicting its own evidence that Ellis was handing up funds to Mr. DeBello.

Despite its intensive investigation in this case, the government has nothing to substantiate its belief that Mr. Pastore occupied the role it attributes to him. The government wrote previously: "NCPD's investigation included about twelve months of wiretap surveillance over multiple cellphones pursuant to state court eavesdropping orders, virtually daily physical surveillance by NCPD detectives of various Gambling Operation participants, and pole cameras, among other investigative means. PSR ¶ 25." (Gov. letter, DOC 637, p.1 ("Factual Background").

Despite the intensity of the government's investigation, there is no evidence that Mr. Pastore had anything to do with anyone other than Ellis's runners in Ellis's operation. There are no pictures of Steven Pastore before or after Ellis went away. There is no evidence he received any "tribute" payments, from anyone, at any time – as the government expert believes would occur if Mr. Pastore were indeed a "soldier" "above" Mr. Ellis in this gambling operation.

Again, Sowulski testified at the Delligatti trial that he had met Ellis's "boss", and did not identify anyone, live or from photos.

We believe that the only purported evidence that Mr. Pastore was a "soldier" as alleged in the indictment, in the pre-sentence report, and the government's submissions, consist of the belief of expert Carillo and the government's belief that, because it *charged* Mr. Pastore with this status, it is true. The government's evidence is *ipse dixit* and insufficient. In the Pre-sentence report, and here, it relies on its own prior charges as if those charges made the allegations true.

Thus, as we wrote in a motion to strike surplusage from the indictment filed December 1, 2017, in paragraph 9(b) of the superseding

indictment, the government charged that Mr. Pastore was charged with being a part of the charged enterprise (the "Genovese Organized Crime Family") in a 2005 New Jersey indictment.

That is true. He was so charged.

What is not true, however, is that Mr. Pastore admitted or in any way pled guilty to the fact of being part of a business "run by the Genovese Organized Crime Family."

The prosecutors may have assumed that Mr. Pastore made the admissions when pleading guilty in New Jersey. But he did not.

When present counsel saw this allegation when Mr. Pastore was first charged in the instant case, counsel contacted the Court reporter in the District of New Jersey case to order the plea minutes. The Court reporter advised that counsel was the *first* person to order and purchase those minutes.

That means that, when the prosecutors indicted Mr. Pastore herein, and charged that in 2005 he "pleaded guilty to participating in an illegal gambling business run by the Genovese Organized Crime Family," they had not seen the plea minutes.

Presumably, they "believed" Mr. Pastore had pled guilty to those facts, because the government had charged it in the indictment. But he had not pleaded to those allegations. The plea minutes, however, which are attached, show no such admission. Rather, Mr. Pastore pled guilty to being in a numbers gambling business with his brother in law, not in a sports betting business. Neither the indictment's allegations, nor Steven Pastore's guilty plea, establishes that Mr. Pastore was a member of the "Genovese Organized Crime Family."[2]

---

[2] The guilty plea does not constitute an admission of facts included in the indictment that were not admitted, and are not facts necessary to sustain the conviction. *United States v. Louchart,* 680 F.3d 635, 636 (6th Cir. 2012). *See also United States v. Thomas,* 355 F.3d 1191, 1196, (9th Cir. 2004), *citing United States v. Cazares,* 121 F.3d 1241, 1246-48 (9th

Nor does the "expert" testimony of Agent Carillo establish that Mr. Pastore was a "made member" of the Genovese family or above Ellis. Agent Carillo has *no* reliable evidence – or the government has not directed us to any -- that would support an organized crime "expert's" conclusion that this is a "fact."

First, it is clear that this "fact" was not "known" in June 2014 when the State obtained an amended eavesdropping warrant. In the application, the affiant made clear that investigators did not then know who Steven Pastore was, much less that he had some pre-existing role. Rather, the 6/4/2014 Amended Eavesdropping Warrant states that Detective LaMorte's surveillance had led the State to believe that Delligatti and DeBello were involved in the "hierarchy" of Ellis's gambling operation: "From our surveillance it appears that Ellis going to jail for several years and that an individual, likely Steven Pastore, will be assuming Ellis's role in this illegal bookmaking operation. However, that transition has yet to happen and thus we are unable to conclusively prove that Pastore will in fact be taking over for Ellis." (p. 6-7, 6-13-2014 affidavit).  One would suppose that, if Mr. Pastore had the status the government claimed, "they" would have said so then.

Second, expert Carillo himself would not recognize as a "fact" that Mr. Pastore was a "member" of the "Organized Crime Family" under Carillo's own criteria. Carillo testified at the Delligatti trial on March 19, 2018 (Tr. 1112-13):

> A. So the newly inducted member, I'll just give an example, he goes out into the street and he has a dispute and he finds

---

Cir. 1997)(guilty plea is an admission of the formal elements of a criminal charge, *citing McCarthy v. United States*, 394 U.S. 459, 466,(1969)); guilty plea does not also comprehend factual allegations not elements of the offense; government has the burden "at the plea colloquy to seek an explicit admission of any unlawful conduct which it seeks to attribute to the defendant.")  What's left of Mr. Pastore's plea in 2005 in New Jersey, therefore, is the fact that he participated in a gambling business with his brother in law.

out this newly made Genovese member wants to have a meeting with a Gambino soldier. They cannot introduce themselves as members of Cosa Nostra. They need a third party that has met officially, officially met them, each one of them separately, and then they would have a meeting with the three of them, and the person that's met both members as people in Cosa Nostra, the way the introduction would go is, meet Joe, he's amico Nostra, which means a friend of ours. That's an official introduction to Cosa Nostra. There is no letter. There is no telephone call that can be made for you, and you are not allowed to acknowledge that you are a made member yourself to another member. You need that third party to introduce you as amico nostra, a friend of ours. The other person knows he can communicate with you hopefully as a member of Cosa Nostra and enter into activities with you.

Q. You used the term officially met someone. That's when a member is officially introduced and told that the person they are meeting with is also a member?

A. That's correct. **Even as an investigator investigating this for so many years, if I receive information from informants stating that somebody is a member of Cosa Nostra, we will make a notation of it, but we won't officially carry them as made until we receive word from a Cosa Nostra member that's either an informant or a cooperating witness that they met them officially. Even if they heard that that member is made, we, as law enforcement, can't substantiate that.** (1112-13)

We have asked the government to identify the basis for stating that Mr. Pastore was made a "member" of the "Genovese Family", as it charges. We have not received a response from the government, much less one consistent with expert Carillo's criteria.

Instead, it wants to rely on "evidence" that would not be sufficient – according to Carillo – to substantiate an accusation that any person was made a "member" of a "Family." Runners' conclusions, made on the

13

taped calls, that Mr. Pastore was an "old-school" "ginzaloon," are not sufficient.  There is no reliable evidence that Mr. Pastore has the status the government claims.  If there is such evidence, the government should provide it in advance of a hearing or drop the claim.

To the extent the government offers Carillo to say that he *heard* that Mr. Pastore is a "member" of the "Genovese Organized Crime Family", this would run afoul of the Confrontation Clause and should not be allowed even in the "looser" context of a sentencing hearing.  *See United States v. Boyle*, 2010 U.S. Dist. LEXIS 6267 *, 2010 WL 286624 (S.D.N.Y. 2010) (McMahon, J.).  As has happened in the past even with a person "proposed" for "membership", individuals deemed "up and coming" by the government have not been "made" as the government suspected.  E.g.,

### *Offer to borrow $50,000*

The government highlights the "fact" of Mr. Pastore's request that the government agree to a non-custody sentence if Mr. Pastore were to pay $50,000 as a forfeiture.  We, counsel, did not ask for the government to agree.  We asked only that it not oppose our request for a non-incarceration sentence.

Counsel made the suggestion that Mr. Pastore would borrow money from his friends and neighbors to come up with a payment to satisfy the government's calls for a punitive penalty.  Friends and family are willing to do this because they are aware that, if Steven Pastore goes to jail, his family will be destitute because they would lose his Social Security and union disability payments, and there is no other income.

### *Conclusion: The government should provide specifics*

The government has agreed that it would produce 3500 material from the trial witnesses.  Other than that, it points only to the discovery we have received – surveillance photos and runners' conversations with each other and with third parties.

Nothing that we have seen supports a conclusion that Mr. Pastore personally obtained any specific amount of the gross receipts. If the government wishes to proceed with a hearing, it should be directed to identify specific amounts it claims it can show that Mr. Pastore personally obtained, from whom he received any such amount, the specific amount, and the date. Forfeiture is not about generalities.

It should also identify the evidence that would satisfy expert Carillo's standards for deeming Mr. Pastore a "member". We could then have a hearing on stipulated facts as to whether the type of proof the government offers, actually supports a specific forfeiture amount.

Again, given Mr. Pastore's financial status and family needs, it is unlikely he can pay anything, and the government's forfeiture number will be financially meaningless to the government. Since the prosecutors *know* that Mr. Pastore cannot pay anything, this forfeiture request is but a punitive device meant not to "disgorge" illicit gains, as the forfeiture statute is meant to do, but rather to put Mr. Pastore's family in unending debt.

We ask that the Court order the government to disclose any evidence that in fact supports a conclusion that Steven Pastore did obtain illicit proceeds. We ask this to inform the Court about the contours of any hearing the Court may order and to suggest that a hearing can be shortened by stipulated facts. We would then ask the Court whether the government's showing satisfies *Honeycutt*.

                                            Very truly yours,
                                            /s/
                                            Vivian Shevitz

Larry J. Silverman, of counsel