Vivian Shevitz<br>
Attorney at Law<br>
46 Truesdale Lake Drive<br>
South Salem, New York 10590<br>
914-763-2122<br>
vivian@shevitzlaw.com

August 5, 2018

Hon. Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re:  United States v. Steven Pastore- 15cr491(KBF)
              -Pre-sentencing letter responding to government
              "factual" submission.

Dear Judge Forrest:

     This letter on behalf of Steven Pastore responds to the Court's Order concerning sentencing/ forfeiture submissions, and the government's submission of August 3, 2018 (GX 702) concerning inferences it wants the Court to draw to support a forfeiture of $125,000. The Court should deny a hearing and/or reject the proposed inferences as unsupported.

     *First*, the government has sandbagged defendant in proposing to conduct a "hearing" with no cross-examinable witnesses. On June 14, 2018, the government stated that it "believes that a hearing is necessary" as to forfeiture. The government proposed then that "[a]t a hearing, the Government would prove, through witness testimony, wire calls, and surveillance photographs, that Pastore frequently met with runners to obtain proceeds of the Gambling Operation and that tens of thousands of dollars in proceeds can be traced to Pastore." (DOC 651).

     Now – by letter dated August 3, 2018 (DOC 702) the government wants to proceed without any witnesses but for a witness to

1

authenticate surveillances, but would rather dump transcripts of recorded conversations between runners Jacobson and Sokol with *unidentified* third parties onto the Court's desk and ask the Court to infer from selected lines excerpted from hundreds of hours of conversations, that Mr. Pastore *received* what it characterizes as proceeds" because these unavailable witnesses told someone else what they owed or, at times, what they had "paid."

Steven Pastore was not a party at the trial at which Jacobson testified. Steven Pastore has never had an opportunity to question statements of Sokol, another runner who says he "paid" Mr. Pastore, on any occasion. Sokol has never testified under oath.

The transcripts submitted by the government are full of ambiguities and inconsistencies, are replete with references to "the guy" or to others who are not explained and are belied by other parts of the same or other transcripts of conversations between Jacobson or Sokol and others.

Moreover, the transcripts concern conversations between Jacobson or Sokol and, generally, some unknown (non-conspirator) third party or one of Sokol's gambling clients -- and the motivation behind their statement concerning payments and/or their dealings with Mr. Pastore has never been probed.

Had these tapes been played at a trial, Mr. Pastore would have had an opportunity to cross examine and find out about the counter-party to the conversations. Now, except for a couple of conversations where the counter party to a conversation with Sokol or Jacobson is identified as one of their betting clients or Jacobson's wife, the counter party is unidentified: "Dave", "Vinny", "Ed", "unidentified" …. It is impossible to defend this.

Even were these statements offered as a statement against interest, it would be important to identify the person to whom statements are made, to evaluate reliability. Here, the government wants the defense to have *no* opportunity to evaluate. Just accept a runner's word, on tape, as if gospel. This is unfair and should not be

2

allowed – especially since the evidence is belied by other, unproduced conversations that show that Jacobson and Sowulski were lying to Mr. Pastore, imagining drama, creating their own daytime opera about the gambling business they found themselves in.

<u>Skewed presentation of "the facts" to smear Steven Pastore</u>

Amazingly, the government relies only on the words of two runners – Scott Jacobson, who testified at the Deligatti trial, but not at any hearing at which Mr. Pastore could cross-examine him, and Mick Sokol, who did not testify under oath at any time– to "identify" Mr. Pastore' "role" in the gambling business.  Only Jacobson identified Mr. Pastore as "the "Bank" (Gov. 8/3/2018 submission (DOC 702), p.2, citing GX 31-T, p.1).  There is nothing to support that attribution.

Instead, Mr. Pastore took over Ellis' runners when Ellis went to jail.  There is no reliable evidence to support any role beyond that.  Mr. Pastore's car was tracked apparently by GPS (though the government never produced any warrant or affidavit – the first time we learned about this was in this pre-sentencing production, where surveillance exhibits refer to such GPS tracking).  Mr. Pastore met with no one except some of Ellis' runners.

The government relies solely on the word of Jacobson to conclude that Mr. Pastore was a "mobster."  (Gov. 8/3/18 submission (DOC 702) p.2).  Jacobson – as the Court has seen in recent revocation proceedings – is hardly the epitome of reliability.

Even at that, the government's discussion of what Jacobson said about, and may believe about, Steven Pastore is skewed.  On page 2 of its August 3 "factual" submission, the government thus writes that Scott Jacobson – who had until then worked under Ryan Ellis -- "described Pastore as a `gangster, mobster' who was 'a scary guy' and 'not a guy you wanted to play games with.'"  The government cites only the trial transcript (T 1771-72) as the basis.

Testimony at those pages does not reflect Jacobson's contemporaneous assessment of Mr. Pastore.  Rather, at those pages,

3

Jacobson is asked to state *not* what he believed about Steven Pastore after meeting and working with him, but rather what Jacobson had meant in a September 20, 2014, when he was first introduced to Mr. Pastore apparently by Ellis, in a conversation Jacobson had with a gambling client.

    The testimony, starting at T. 1770, thus reads:

Let's all turn to Government Exhibit 337-T.
18 THE COURT: 337?
19 MR. SWERGOLD: Yes, your Honor. 337-T.
20 Q. Are you there, Mr. Jacobson?
21 A. Yes.
22 Q. What is the date and time of this call?
23 A. September 20, 2014, 1:03 p.m.
24 Q. And do you see the intercepted call number?
25 A. Yes, I do.

1 Q. Whose phone number is that?
2 A. That's my phone number.
3 Q. Who are the participants on this call?
4 A. Myself and Ari Morris.
5 Q. Who is Ari Morris?
6 A. A good friend of mine.
7 Q. Was he one of your players at the time?
8 A. Yes, he was.
9 Q. Just so we're clear, when we use the term "players," what
10 does that refer to?
11 A. He was one of the gamblers that gambled through me.
12 MR. SWERGOLD: Ms. Harney, if we could play Government
13 Exhibit 337-T, please. I'm sorry. That's the transcript. We
14 need Government Exhibit 337.
15 (Audio played)
16 BY MR. SWERGOLD:
17 Q. Okay, Mr. Jacobson. When you said, this F"ing wiseguy, who
18 were you referring to?
19 A. Steve Pastore.
20 Q. What did you mean by that?

4

**21** A. Gangster, mobster.
**22** Q. Who else, if anyone, in the gambling operation would you
**23** describe as a wiseguy?
**24** A. Baldy.
**25** MR. SWERGOLD: Now, Ms. Harney, if we could play the

I3QYDEL1 Jacobson - Direct Page 1772

**1** second part of 337.
**2** (Audio played)
**3** BY MR. SWERGOLD:
**4** Q. All right, Mr. Jacobson. If you would turn to page 2 of
**5** the transcript, lines 11 and 12, where you said, a no-F'ing
**6** around old-school guy, what did you mean by that?
**7** A. He was old school. It's pretty self-explanatory, a scary
**8** guy. He was not a guy that you wanted to play games with.
 pretty self-explanatory, a scary
**8** guy. He was not a guy that you wanted to play games with.
**9** Q. And who were you referring to?
**10** A. Steve. (1771-72)

_____

The government *did not* produce a copy of the transcript that Jacobson was explaining. It did not give the defense a copy either.

Scott Jacobson did not even *know* Mr. Pastore as of that time. "Baldy" (Ellis) was still around; one of Jacobson's conversations on that day was between Jacobson and "Baldy" (Ellis).

Indeed, the date on which this conversation between Jacobson and his good friend/player was around the first day that Jacobson *met* with Mr. Pastore, and Ellis (Baldy), after an initial meeting earlier.

Whatever Jacobson believed about Mr. Pastore as of then, it did not come from his observations or dealings with Mr. Pastore. It all must have emanated from hearsay or, more likely, from Jacobson's imagination.

5

Transcripts the Government did *not* provide

On July 17, 2018, the government turned over a report of calls involving or mentioning Steven Pastore. Only a handful of *selected* excerpts were transcribed and provided to the Court. Many transcripts – aside from the one shown to Jacobson at trial – were not produced. We have only limited knowledge of what was said.

Since the government had stated it would call live witnesses, and since Mr. Pastore has never had an opportunity to challenge statements by Jacobson and Sokol on the tapes, we, of course, did not have the motive or opportunity to make transcripts of all the calls.

However, now the issue has arisen. We will quote from the Report provided by the government excerpting a "synopsis" of several calls made, apparently, by the agents who monitored the conversations, which we have excerpted here to show that the calls concerned the somewhat unremarkable "normal" workings of a gambling operation.

Thus:

On April 14, 2014, Scott Jacobson told "Bridget" that he was reluctant to tell her where he was going – apparently because he had promised Bridgett he would stop his own gambling, but did not. He told "Bridgett" that Baldy (Ellis) was "going away" and he was "introduced to someone (Pastore) who will be taking over for him". (Ref. number 11478, 4/16/2014).

Later on 4/16/2014, Jacobson called "Vinny". (Ref.11479). Vinnie was worried about how the meeting went. Jacobson said "Yea it was alright". Vinny asked whether Jacobson "g[o]t smacked around a little bit." Jacobson said: "Na, no it wasn't like that at all" -- meaning that, though he might later have described Mr. Pastore as a "gangster" to impress his "good friend" and gambling client, Mr. Pastore was not "like that at all".

6

On 4/18/2014, Jacobson tells "Vinny" about Ellis "coming to his house to scare him and collect money from him." Jacobson says that Ellis is going to jail and that he (Jacobson) "had a meeting with the new guy he will be dealing with." "They talk about someone maybe taking over his book." "They talk about Scott losing about 20K in gambling."

On May 14, 2014, Mick Sokol told someone (unidentified by Monitoring agent Lamorte) about "losing 8K betting with his heart. Minimized". "Mic bets on his own book and with other books." Mic "is in the red for 25K and he can't make any money." He "talks about fading away from Ellis and moving over to someone else." Sokol "talks about different options on how he can leave Ellis. He says that Joe (Tedesco [per Lamorte]) told him that Ellis has over 700 players. They call Ellis "Zeus". Right now Ellis owed Sokol money so he doesn't want to leave. Sokol mentioned he met with Steve (Pastore) who is suppose to start collecting because Ellis is going to jail." Mick's sheet is 25k in the red." (Ref. 857).

> This is a prime example of the unreliability and exaggeration of the conversants. If taken as true, Ellis' gambling operation would incur $70,000 per week – a quarter of a million dollars a month – in expenses in order to allow bettors to bet. Even the government would concede that such expense would be ludicrous.

On June 20, 2014 Sokol called Joe Tedesco. He was trying to get in touch with Ellis but had not met with Ellis for three weeks. "Mick [Sokol] tells Joe that he was suppose to start meeting with Steve (Pastore) but he hasn't heard from him either." (Ref 3900).

On August 24, 2014, Sokol "tells Nick [unidentified further] that he [Sokol] laid out $200 for him. He "had to take money out of his girl's wallet to pay for him and then he put the money back in the envelope" [meaning, this is not direct proceeds paid.] (Ref 13684).

On September 16, 2014, Sokol talked to "Nicolas" "about paying his gambling debts this week. Santiago tells Sokol that he will put the money in the bank. Sokol ref. Pastore telling Santiago that he doesn't want to keep shorting him. (Ref 18738).

On September 20, 2014, at 1:03 pm – in a conversation identified by Scott Jacobson at the trial (T 1771), "Ari Morris" (apparently one of Jacobson's bettors) called Jacobson and talked about "strange things with their phone." Jacobson reportedly "talks about meeting this wise guy (Pastore) nervous because guy is not there. Jacobson says that he "owes his guy $3000 and even if he empties his bank account he's still short." "Says this guy is old school guy". (Ref 26921).

> -This was the conversation highlighted by the government in its submission here. At trial, the government elicited that Jacobson had also characterized Mr. Pastore as a "mobster". (T 1771). It seems obvious that Jacobson was talking up Mr. Pastore to 'impress" his gambling client.

On September 20 2014 at 3:01 pm, a call "monitored partially", (Ref 26939), Jacobson and Pastore agreed to meet, and Jacobson "says he has to stop by a chase Bank first." [Whatever he took from the bank therefore was not "proceeds"].

A bit later that same day (Ref. 26942), Ellis called Jacobson (obviously Ellis had not yet gone to jail) and asked him how long it should take to go 8 blocks to meet him. Jacobson told Ellis he had told him he (Jacobson) had to stop at the bank – meaning that Jacobson intended to get money, nor proceeds, to pay a gambling debt.

There are other calls that the government did not highlight. But some show that Sokol wanted to pay with his own funds, not "proceeds".

On October 1, 2014, Jacobson tells Vigorito, his client, about "taking a big hit this past Sunday" and how he was not sure what to pay the guy". Vigorito told Jacobson to ask Baldy" to give him a pass". Jacobson said he did not call anyone because there aren't any numbers to call. He had to just meet Pastore. He told Vigorito that "Baldy" was "out of it." (Ref 28155).

On October 4, 2014 (Ref 28413), Jacobson told Vinny he was meeting with Steve Pastore and was "going to short him (Pastore)

8

around 5k". Jacobson said he had trouble collecting from Mike's guys and "one of his guys is in a different bank and the money takes a while to clear. Mike also shorted him." Meaning, these were not proceeds but was money from a bank, and the amount were never ascertainable.

On October 11, 2014, Sokol told "Dave" "that he lied to Pastore and told him that he has training next week and will not be able to see him." "Pastore told him as long as he is not trying to pack things in he can `carry it over' to the following week." He spoke about borrowing from his 401k (hence, not "proceeds") to pay. Sokol was even trying to play lotto to win." (Ref 26213).

On October 13, 2014, Mick Sokol told an unidentified male "that he lost 80k to Zeus and another 20k to Ed. Sokol is in debt for over 100k. Sokol asked "Rena" for money and she told him no."

On October 14, 2014 (Ref 27468), Sokol told "Dave" about borrowing money from Donnay (to pay his gambling debt." Sokol says "he's gonna lie and tell the guy (Steven Pastore [according to the monitor] that he had a bettor named Jig (who is really Jig) Mick says he's gonna tell (Pastore) that Jig couldn't pay. Later notes identify "Jig" as Sokol himself.

On October 16, 2013 (Ref 29406) Jacobson said he was supposed to see "him" but apparently did not.

On October 18, 2014 (Ref 29633), Pastore called Jacobson and said there was a mixup. They were at two different places.

On October 20, 2014 (Ref 29797), "Scott [Jacobson] wants to scam Honda to eat the payment on the car". Scott tells "Mike" "he just met with Pastore" (see surv #335). Scott asks Mike why he is betting when he told him to take it easy on the accounts." Scott tells Mike that he "told Pastore to eat the red on that sheet (Mike's sheet) and that Pastore told him no. Scott tells Mike that he "told Pastore that he was going to settle up all his red on the sheets and then walk away from him." According to Scott's recitation to Mike about what Scott had supposedly told Pastore at the time," Pastore told him "that he will find

9

out where he goes and then approach that book and get him right back. He told Scott he cannot leave his book. Pastore [supposedly] told Scott "to hold off paying a couple of weeks if he needs money and he will carry him but that everything will be paid and Scott isn't going anywhere." Pastore supposedly told Scott that, if Scott could not make collections, then Pastore would go to "Benny" and collect from him. Scott claimed to "Mike" that "he is a money-making machine and Pastore isn't giving him a lead way on the sheet." According to Jacobson, to Mike, "Pastore then got nice with him at that point." Apparently to celebrate, Scott bet on Denver and Mike took the opposite bet.

On October 25, 2014 (Ref 0"), "Sokol talked to someone about Joe, and Sokol told someone "he gave (Pastore) $34,700, $10,000 short." We do not know who the counter party was, and there appears to be zero corroboration of this. However, in that conversation (if it is the same one the government gave the Court, **Sokol tells the counterparty that Mr. Pastore is actually a nice guy**, who was businesslike, but wanted to work with his runners. (October 25, 2014 p.4).

On October 26, 2014 (Ref 29750 and Ref 30352), "Mike" told Jacobson that he is coming home, and Jacobson told "Mike' to stop at the bank and pick up the $800 that he owes to Pastore. If this was paid, it was money from the bank, not proceeds.

On December 1, 2014 (Ref "O", monitored by Angelo Lamorte), "Mick" (Sokol) talks to "Dave" about borrowing 50K. "He wants to pay off all the outstanding loanshark loans. "Mick wants to pay off loans "so he can start betting again. Sokol tells "Dave" he is "afraid that Pastore is going to ask for a sitdown. Sokol tells "Dave" he had "just lost 65k and Pastore gets half of that so he shouldn't be mad but you never know …." "Mick tells Dave that Pastore doesn't know who owes what but if he wants to sit down and go over the books he will find out and Mick will have to think fast as to what to tell him."

On December 6, 2014 (Ref 34733), Sokol tells "him" (unidentified by Monitor Lamorte) about the meet with Pastore. "He told Pastore" (so he says on the tape) that he has one customer that has skipped town and owes $65k. Mick is eating 40k and owes 30k to Pastore. Mick

10

described how it was a longstanding account and that Ryan Ellis would say it had not been a problem.  "Mick" Sokol claims he asked Pastore to "forgive the debt and Pastore told him that they will put it aside and he will have to pay it off from his commission."  Mick told "him" that he did not like this deal and "tried to work out different plans and Pastore said no."  According to Mick (to "him"), Pastore had told Mick that "he has to break this guys balls and Mick had said he isn't going to puch[sic] it and get in trouble."   Mick then told "him" that he shorted him (Pastore) today; he only paid 5k and owed him 49k.  Mick said he assured that Ryan Ellis would agree that there had never been a problem with the bettor and it was OK.

On January 3, 2015 (Ref 38006), Sokol told "Dave LNU" "about meet with Pastore and MS [Sokol] says he (Pastore) flipped out a little.  He said he had just gotten back from Florida and talked about owing one of his bettors (fictitious) $20,000.  Sokol told "Dave LNU" he "gave him (Pastore) $15,000 and kept $1000 for himself.  Sokol also told "Dave LNU) that he owed (Pastore) $51,000.  Sokol supposedly referenced "Dave LNU" as "Boogie" during the call.  The monitor's report references surveillance 383.

On January 8, 2015 (Ref 37423) Jacobson called Pastore, who told Jacobson he owed $20,947, and arranged to meet Monday.

Later that day, January 8, 2015 (ref 37426) Jacobson told Bridgett had had to "get on top of his buys" to "get like $20,000 for him.

Yet later that day, January 8, 2015 (Ref 37448) Jacobson said he had a special bank account that was "built up to about $6,000).

On January 16, 2015 (Ref 1239) Michael Kornbach called "Tomas Coyle" and discussed money owed to "the guy.  The agent states that "Stevie" in this conversation "refers to Stevie O from Clemente's who is running the Super Bowl pools."   It should be noted that Kornbach was an agent for Ellis, who never met with Mr. Pastore during the surveillance period.

11

On January 26, 2015 (Ref 9748), Ryan Ellis' mother Marianne Ellis called Luigi Caminiti and said she was upset with Caminiti.

On January 29, 2015 (Ref 39316) Scott Jacobson called "Ari Morris" and explains how, when he was looking for Ryan Ellis, he ended up "in the basement, with like fifteen people with three piece suits, smoking like $200 cigars." It is unclear when this happened. Jacobson is reported to have said that "all he knows is his guy (Ryan Ellis) is going on a pinch (Jail) for something totally different (then gambling). SJ says now he (Ryan Ellis) is introducing him to The Guy (Pastore), you know like the bank. So now it turns out this guy the Bank is from Staten Island. SJ says The Guy (Pastore) and SJ says he won't call him or see him on a Friday or Saturday for like $2,000"

- **This is the *only* reference to Steve Pastore being "the bank"** that we have seen in this case. It seemingly is a recitation by Jacobson to "Ari", on January 29, 2015, about some conversation about Pastore at some much earlier time – since Ellis had gone away on a pinch" in September.
-
- It is impossible to discern more without cross examining Jacobson. The government appears content with relying on this dramatic statement by Jacobson as it "proof" that Steven Pastore was "the bank". All other evidence is contrary to this. Steven Pastore was a pinch hitter for Ellis being the agent for *his* runners.

On February 4, 2015 (Ref 39725) Vigorito told Jacobson that "he can't afford to give money to Jacobson" and that Jacobson should let "the guy know that Baldie would understand."

The final call on the Report produced earlier to us by the prosecutor occurs on February 6, 2015 (Ref 40259). Sokol said he had nothing to give Pastore.

_____

12

In sum, these conversations demonstrate that the runners lied to Steve Pastore, exaggerated, were irresponsible and unreliable, had no fear of Steven Pastore, no fear of lying to Steven Pastore, no fear of not paying Mr. Pastore, and had a total disregard for the truth. Mr. Pastore did nothing here that would establish any role in this operation aside from being a pinch hitter as to Ellis' runners.

False statement in the government's letter about its evidence

We have had little time to "vet" the statements in the government's August 3, 2018 letter concerning surveillances and what agents saw that supposedly confirm the receipt by Steven Pastore of "proceeds" of the gambling business/ RICO. One example, however, demonstrates that government took "liberties." It appears endemic – part of the cause to get "forfeitures" (which go to the DOJ's coffers) instead of fines (which go to the Court).

The government writes that on October 27, 2014 Jacobson told "Dan" that his players had lost but he had won, so had to "pay back my partner". The government writes that there was a surveillance and "a detective observed Jacobson place a white envelope in Pastore's vehicle." Although the amount is minimal ($800), the lack of concern for facts is not.

We checked the trial minutes pertaining to any surveillance on this date (but not having been at the trial, do not fully know what surveillances were the subject of testimony). However, we found that Detective Clinton testified about this particular October 27, 2014 surveillance. (T 1042-43).

Cintron did not testify that he had seen an "envelope"; he said he saw a "white paper".[1] There is no doubt that Mr. Pastore discussed

---

[1] Q. Detective Clinton, do you recognize these photographs?
12 A. Yes, I do.
13 Q. How do you recognize them?
14 A. That depicts what I saw that day on the surveillance.
15 Q. So it depicts what you saw on October 27, 2014, when you

gambling debts, which were on paper. There *is* doubt about *all* the alleged payments and the specific amounts.

We don't know if there are other such false attributions to detectives. The Deligatti trial was not about Steve Pastore. We do

---

16 were surveilling the Positano's area?
17 A. Correct.
18 MS. ESTES: Your Honor, the government offers
19 Government Exhibits 722-A through 722-C.
20 MR. QUIJANO: No objection.
21 THE COURT: Received.
22 (Government's Exhibits 722-A through 722-C received in
23 evidence)
24 MS. ESTES: Ms. Brady, could you publish Government
25 Exhibit A. Please zoom into the people in the photograph.
I3JYDEL4 Clinton - Direct Page 1043
1 Q. Detective Clinton, who do you see in this photograph?
2 A. I see Steven Pastore in the brown shirt on the right and
3 Scott Jacobson in the blue hooded sweatshirt on the left.
4 Q. Were these individuals targets in your investigation?
5 A. Yes, they were.
6 MS. ESTES: Thank you, Ms. Brady. You can put that
7 down.
8 Can you please publish Government Exhibit 722-C.
9 Ms. Brady, could you zoom again to the people in this
10 photograph.
11 Q. Detective Clinton, what do you see here?
12 A. I see Scott Jacobson on the left and Steven Pastore with
13 the white paper in his hands on the right.
14 Q. So you said you saw white paper in his hands?
15 A. Yes.
16 Q. Do you know what was written on that paper?
17 A. No, I don't.
18 Q. Could you hear anything they were discussing that day?
19 A. No, I couldn't.
20 Q. Approximately how long did you see them together?
21 A. About 20 minutes. (T.1042-43)

know there is reason to doubt the reliability of the government's current descriptions of its evidence.

Debt payments, not "proceeds"

The government has not shown that Steven Pastore obtained *any* "proceeds" of the gambling or "RICO' business. It may have shown that Mr. Pastore received some amount of debt payments from runners, but Mr. Pastore was not charged with collection of "unlawful debts."

While there is no definition of "proceeds" in the statute, "proceeds" is commonly defined as "the amount of money received from a particular event or activity or when something is sold". As to this gambling business, then, "proceeds" is the amount of money paid to the business by *bettors*. However, when the runner who obtains a bettor's money uses it otherwise, there are no longer "proceeds" in his hands.

On the other hand, 18 U.S.C. §1961(6) defines an "unlawful debt":

> (6) "unlawful debt" means <u>a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof</u>, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate…. [emphasis added]

No doubt Congress added this to RICO *because* of the impossibility of tracing "gambling winnings" and "gambling debts".

"Proceeds," on the other hand, requires the *tracing* of moneys obtained by the runners to another person. This is what is required of a RICO forfeiture after *Honeycutt*.

15

While money used in a gambling business can be seized by the government when a defendant or business is charged with a "gambling business operation", 18 U.S.C. §1955, here Steven Pastore did not plead guilty to a gambling business – although that is the only thing he did in this case. Instead, the government required him to take the RICO or be forced to an expensive and time-consuming trial. With RICO's "elastic" definitions of "enterprise", a defendant's participation with a "group" in a "gambling business" is, in essence, the same thing as participating in a RICO.

The government is thus limited in obtaining "forfeiture" in this case to proceeds *traceable* to Mr. Pastore. There are no such "proceeds" shown here.

Mr. Pastore acknowledges that he is responsible for a fine, if the Court chooses to impose one, but that must be limited by what a defendant can pay. The government is "entitled" to such fine in this case, but not "forfeiture".

Further, the *amount* of forfeiture sought by the government shows that it is acting arbitrarily and vindictively. The government agreed to forfeitures of $75,000 and $90,000 from Ellis and Deligatti – both of whom were involved in this gambling operation for *years*. Mr. Pastore, on the other hand, was involved only for *four months*, from September 2014 through January 2015, only during Ellis' incarceration.

The government knows that Steven Pastore has no assets other than his family home (his wife's) and 401k moneys he received many years earlier. In order, however, to satisfy the government, he offered to borrow $20,000 from family and friends and thereby agree to forfeiture. The government declined.

<u>The government continues to misconstrue Steven Pastore's role in this gambling operation</u>

In June 2014, warrants were drafted in order to obtain information in the gambling operation, by the Nassau County D.A.'s

16

office. At that time, the government stated that it was unaware of Mr. Pastore's role, but believed he was going to be taking over Ellis's role when Ellis went to jail.

The government has repeatedly claimed to this Court that Ellis was only an "agent" responsible for interfacing with his runners. Mr. Pastore took over for Ellis sometime in September 2014 and according to the government, continued in that role until January 2015. During this period, he performed some of the tasks Ellis performed, but not all.

In its June 1, 2018 letter to this Court, the government acknowledged that it had 12 months of wiretaps, "virtual daily physical surveillances", to use the government's words, in an investigation started in August 2013, to January of 2015. None of the evidence gathered during that period of intense investigation shows that Steven Pastore supervised anyone, other than some of Ryan Ellis' runners. He assumed the role of "agent" – the same role that the government uses to describe Ellis.

Additionally, Mr. Pastore, when he took over for Ellis, is not even shown to have supervised *all* of Ellis' runners. This is corroborated by the fact that the government "GPS'd" Mr. Pastore, and so would have seen him meeting with others, if it happened. The GPS supports the *fact* that Mr. Pastore did not meet with other "crime" members, did not go to social clubs, did not go to late-night events at various restaurants, and did not act like a "crime" member. [2]

---

[2] At times the government has suggested that there were threats. The closes thing to a "threat" that any witness talked about was actually a *reprimand* of Jacobson by Ellis. Jacobson testified (T.1736-41) that, when he, Jacobson, told Ellis he would show up at a meeting, and did not, Ellis "reprimanded [Jacobson], pretty upset." Jacobson testified that Ellis came to his house and was "threatening" Jacobson, "always telling me, no matter what, answer the phone." (T.1740). Ellis apparently meant to teach Jacobson the "etiquette" of at least answering phone calls and not lying to him (Ellis) when he said he would be at a meeting. There were no threats made by Steven Pastore at any time.

It also should be noted that the government has identified that Ellis, while an agent, gave moneys to Debello, an alleged "organized crime" member, and that, when Ellis was incarcerated, Debello, in turn, directed that payments should be made by Caminiti, one of Ellis' runners, to Ellis' mother, from gambling proceeds. Mr. Pastore, though now alleged as some "super-agent" or "bank", received nothing, and directed nothing.

We have brought up previously that the government made a mistake when it indicted this case. It relied on a 2006 New Jersey policy gambling case, in which the government had *charged* Mr. Pastore with others involved in what the government charged as an "organized crime" "enterprise."

The government did not have the plea minutes at the time Mr. Pastore was indicted in *this* case. I know because I was the first person to order the minutes, after I saw the indictment in *this* case.

Mr. Pastore did *not* plead guilty to that aspect of the charge. He pled guilty to participating in a policy operation with his brother -in-law. Allegations in an indictment that are not necessary to the charge – there, that the business was that of an "organized crime" group – are not admitted. Mr. Pastore has *never* been established to be what the government has posited he is in this case, without evidence.

The government made a mistake in assuming the plea in the New Jersey case, and has acted as if it had not done so. The forfeiture request is apparently an indication that it will stick to its false belief, though we provided the actual New Jersey plea minutes previously.

All the evidence in *this* case shows that Mr. Pastore was a substitute teacher, so to speak – a temporary replacement for Ellis. He should not be sentenced for more than he did. He should not be subjected to forfeiture on that basis either.

Summing up, as to "forfeiture", Mr. Pastore's position is, and always has been, this: The issue is not whether or not Mr. Pastore

18

received some funds at times. The issue is that the government has not identified (a) how much money was paid, actually, on any day; (b) the source of that money, i.e., money from losing bettors, or runners settling their own personal accounts; and (c) that the source of any money was actual "proceeds".

## Conclusion

If the Court does not rule that, on this evidence, the government has not and cannot prove "forfeiture", it should order the government to call Sokol and Jacobson as witnesses and in any event set forth any of the evidence they have to show that conclusions about Mr. Pastore are based on Sokol's and Jacobson's personal knowledge as opposed to their colorful suppositions.

                                                   Very truly yours,
                                                   /s/
                                                 Vivian Shevitz

Larry J. Silverman, of counsel